DANIEL W. ISAACS, ESQ. (DI-5179)
**LAW OFFICES OF DANIEL W. ISAACS, PLLC**
122 Cross River Road
Mount Kisco, New York 10549
Tel:(646) 438-2100
E-mail: daniel.isaacs@danwisaacsesq.com

Attorneys for Plaintiff, 104 S. Division St. LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x
104 S. DIVISION ST LLC, AVRUM CHAIM        Case No.
LEBRECHT and SHIA LEBRECHT,

                    Plaintiffs,          **COMPLAINT**

          - against -

CITY OF PEEKSKILL, THOMAS LEONARD,
and NICHOLAS CECERE,

                    Defendants.
- - - - - - - - - - - - - - - - - - - x

        Plaintiffs, 104 S. Division St LLC ("104"), Avrum Chaim

Lebrecht ("Chaim") and Shia Lebrecht ("Shia"), by their attorneys,

The Law Offices of Daniel W. Isaacs, PLLC, complaining of the

Defendants, City of Peekskill ("Peekskill"), Thomas Leonard

("Leonard") and Nicholas Cecere ("Cecere"), allege as follows:

                    ## NATURE OF THE ACTION

        1.   Plaintiff 104 is a limited liability company duly

organized under and existing pursuant to the laws of the State of

New York. Plaintiffs Chaim and Shia[1] are the sole members of 104

and Hasidic Jews, who reside in Rockland County New York.

---

[1] Shia would use the name "Andy Gordon" professionally.

2.   In February of 2018 plaintiffs purchased a commercial property located at 102-108 South Division Street (known locally as the "Riley Building") in the City of Peekskill, County of Westchester for $850,000.00.  Plaintiffs subsequently invested over $1.4 million to renovate the property and earn mix-use approvals.  Variances and permits were received, without issue, that permitted the bottom portion of the building to remain commercial with the upper floors comprised of residential units (the "Project").

3.  The stated mission of Peekskill's Building Department "is to serve the residents, the community and the visitors of the City of Peekskill by increasing quality of life and protecting health, safety, and welfare, through education and **the fair** and effective **application of local codes and ordinances to all properties within the City.**" (emphasis added).

4.  As set forth below, Peekskill's Building Department failed in its stated mission and condoned the unlawful, unequal and arbitrary actions of its agent, servant and/or employee, Leonard, which were grounded in his religious animosity towards plaintiffs, and condoned by the defendant, Cecere, thereby violating their constitutional rights.

5.   On November 14, 2019, shortly after being hired by Peekskill, the defendant Leonard, one of two Assistant Building Inspectors for Peekskill's Building Department, while in the scope

and course of his employment, began a nearly three-year malicious and unlawful campaign against plaintiffs because its members, Chaim and Shia, were Hasidic Jews by, *inter alia*, unequally and arbitrarily enforcing Peekskill's rules and regulations, in selectively enforcing Peekskill's rules and regulations against plaintiffs, in improperly issuing stop work orders, directing unnecessary changes to work already completed and approved, and delaying without cause approval of plans properly submitted, amongst other demands.

6.    The defendant, Cecere, actively participated in, condoned and otherwise approved, both express and implied, defendant Leonard's unlawful campaign against the plaintiffs, 104, Chaim and Shia.

7.    That due to the wrongful acts of defendants Leonard and Cecere, plaintiffs 104, Chaim and Shia suffered additional and unnecessary costs and expenses, in excess of $100,000.00, as well as an unjustified delay of nearly three years in obtaining a Certificate of Occupancy, thereby losing approximately $1,000,000.00 in gross rent as well as incurring approximately $500,000.00 in construction loan-related interest expenses. Plaintiffs Chaim and Shia have also suffered emotional damages due to defendants' unlawful conduct.

8.    As set forth below, defendants' conduct violated plaintiffs' rights guaranteed under the First and Fifth Amendment

to the United States Constitution. Defendants' conduct further violated the New York State Human Rights Law.

9.   This action is therefore brought seeking damages pursuant to 42 U.S.C. § 1983 to redress the violation of plaintiffs' constitutional rights to be free from religious discrimination and their right to due process under the First and Fifth Amendments to the United States Constitution. Plaintiffs also assert a derivative cause of action for the violation of the New York State Human Rights Law, N.Y. Exec. Law. §290 *et seq*.

<u>**JURISDICTION AND VENUE**</u>

10.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a) (civil rights jurisdiction) because this action is filed to obtain relief for the deprivation of the rights of citizens of the United States secured by the United States Constitution and federal law pursuant to 42 U.S.C. § 1983.   Plaintiffs also assert state-law claims over which Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

11.    As plaintiff 104 is a resident of the County of Westchester and plaintiffs Chaim and Shia reside in the County of Rockland, State of New York, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).

12.   This Court has personal jurisdiction over the defendants because they were domiciled, conducted business and/or otherwise engaged in the acts complained of within the State of New York.

<u>**PARTIES**</u>

13.   That at all times hereinafter mentioned the plaintiff, 104 is a limited liability company duly organized under and existing pursuant to the laws of the State of New York.

14.   That the plaintiff, Chaim, is a member of 104, its managing director, and a Hasidic Jew who resides in Rockland County New York.

15.   That the plaintiff, Shia, is a member of 104, served as the project manager for the Project and a Hasidic Jew who resides in Rockland County New York.

16.   That at all times hereinafter mentioned the defendant, Peekskill, is a municipal entity located in the County of Westchester, State of New York.

17.   That upon information and belief and at all times hereinafter mentioned defendant Peekskill's Building Department (the "Department") employed one Building Inspector, two Assistant Building Inspectors, one Code Enforcement Officer, one Plumbing Inspector and one Senior Office Assistant. The Department issues permits pertaining to, *inter alia*, buildings, driveways, fences and signs, as well as Certificates of Compliance and Certificates of Occupancy. The Department also inspects all new construction,

alterations, and additions, and also performs code enforcement and fire/safety inspections for residential and commercial property.

18.  That at all times hereinafter mentioned the defendant, Leonard, was one of the Department's two Assistant Building Inspectors.  Upon information and belief and at all times hereinafter mentioned defendant Leonard, while employed by the defendant, Peekskill, contemporaneously owned and operated a local home inspection business, JT Home Inspections Inc., a fact known to Peekskill's officials, who condoned this blatant conflict of interest.

19.  That at all times hereinafter mentioned the defendant, Cecere, was the Department's Building Inspector and Leonard's immediate supervisor.

## FACTUAL ALLEGATIONS

20.  That on February 5, 2018, plaintiffs purchased the commercial property known as 102-108 South Division Street in the City of Peekskill, Block and Lot Number 33.37-3-3 (the "Property"). At the time of the purchase the Property was an 8,000 square foot single-use commercial, four-story structure with a vacancy rate of approximately Fifty (50%) Percent.  The plaintiffs subsequently invested over $1.4 million to earn mix-use approvals and complete a full-gut renovation, which included, *inter alia*, demolition, framing, electric, plumbing, sprinklers, insulation, fire stopping, sheetrock, paint, tiling and fixtures.

21.   That when plaintiffs purchased the Property in February of 2018, the Department's Building Inspector was Jeff Roma ("Roma").

22. That on October 30, 2018, a Certificate of Appropriateness was issued by Peekskill's Historic & Landmarks Preservation Board approving exterior improvements to the Property's façade inclusive of the removal/addition of new windows, addition/removal of brick wall segments, the extension of a fire scape on the top floor, a new entryway and door system on the ground level, relocated exterior drainage pipe, new Marvin windows, and new/repaired window lintels.

23.   That on December 11, 2018, Peekskill's Planning Commission voted to grant a Special Permit, and a Final Site Plan Approval, which expired on June 11, 2019.

*2019*

24.   On April 8, 2019, plaintiffs' architect, Patrick M. Croke ("Croke") submitted to Roma a full permit submission package that consisted of architectural drawings and plans for demolition work, and installation of HVAC, framing, electric, plumbing, sprinkler systems, and fire alarm protection.  Approximately two weeks later, without delay, Roma returned to Chaim the entire package together with approval for a building permit for the Property and indicated that only the electric and plumbing work needed separate permits. Roma subsequently issued permits for the electrical and plumbing

work, the latter of which included the sprinkler system and a fee of $150.00 for same.

25.  On May 18, 2019, a building permit was issued for the Property by Roma and demolition work started on June 17, 2019.

26.  Shortly before Roma retired as Peekskill's Building Inspector on August 23, 2019, defendants Cecere and Leonard were hired.

27.  By October of 2019, plaintiffs had completed the framing, plumbing, electric, HVAC and sprinkler system pursuant to the plans submitted in April and approved by Roma.

28.  On November 14, 2019, after being assigned to the Property, defendant Leonard began his unlawful, unequal, arbitrary and discriminatory campaign against plaintiffs when he falsely alleged that bricks were falling from the Property.  In fact, the bricks were removed from the Property's exterior due to holes being drilled for the fire protection system and placed on the sidewalk. Despite no proof being provided defendant Leonard ordered that scaffolding be put in place.  The scaffolding remained until June of 2021 when the defendant, Cecere, ordered that it be taken down due to a parade that was taking place without any work having been performed on the brickwork.  The total cost to plaintiffs of the unnecessary scaffolding was approximately $25,000.00.

29.    That same day, defendant Leonard arbitrarily and capriciously issued a Stop Work Order purportedly due to "Dangerous situations due to framing" and the falling bricks, which were not true.

30.    On November 20, 2019, plaintiff's licensed Engineer, Peter G. Marchetti, P.E. ("Marchetti"), inspected the Property and identified the structural and mechanical modifications required for the installed framing.

31.    On November 27, 2019, Roma inspected the Property with the defendant, Leonard.  During the inspection defendant Leonard told Chaim that plaintiffs could proceed with the installation of insulation, reflecting his satisfaction with the framing.

32.    On December 23, 2019, the Stop Work `Order was lifted when the scaffolding was erected.

*2020*

33.    In early January of 2020, Puff came to inspect the plumbing work performed together with the defendant, Leonard, who revoked his approval for the framing work.  On January 17, 2020, Roma accompanied Leonard to re-inspect the property, following which Leonard orally gave Roma, who had been retained as a consultant by plaintiffs, a list of work items without providing a formal punch list.

34.   On April 23, 2020, plaintiffs met virtually with the Historic & Landmarks Preservation Board, who approved a roof platform.

35.   On May 12, 2020, Plaintiffs met virtually with the Planning Board, who approved a roof hatch.

36.   On June 25, 2020, Chaim sent an email to defendants Cecere and Leonard asking what was needed to obtain a permit for the roof hatch and approval for the repair work performed on the framing.

37.   Defendant Leonard replied by requesting detailed drawings for all brick façade/framing connections, all repairs for damaged or improperly framed TJI Joists, and all mechanical venting for bathrooms.  He stated that many floor joists were not supported properly and that there were several issues with the exterior brick façade fasteners.

38.   Defendant Leonard then falsely claimed that "work that was being done a few months ago [in the Property's basement] actually cause [sic] severe injuries to a worker." (the "March 28, 2020, accident"). He then demanded that the "damaged section of foundation" – there was in fact none – be looked at by a licensed engineer and detailed drawings showing what work needed to be done to repair the damage be submitted.

39.   Leonard's claim was patently false.  March 28, 2020, was a Saturday and the Property was therefore closed in observance of

the Jewish Sabbath.  Moreover, the Property was also shuttered due to the "New York State on PAUSE" executive order signed by then Governor Andrew M. Cuomo on March 20, 2020, a 10-point policy that included a directive that all non-essential businesses statewide close in-office personnel functions effective at 8 p.m. on Sunday, March 22, 2020, and temporarily ban all non-essential gatherings of individuals of any size for any reason.

40.  In fact, the accident took place at the premises known as 935 South Street, which is located behind 102-108 South Division Street, and plaintiffs were absolved of any wrongdoing by OSHA in May of 2020.

41.  On July 2, 2020, Chaim emailed James Howard ("Howard"), the Deputy Chief of Peekskill's Fire Department, and the defendant, Cecere, requesting that a sprinkler inspection be scheduled for the Property.  Howard responded the following day, July 3, 2020, stating that all inspections be coordinated through the assigned building inspector, even though ordinarily it was coordinated by Peekskill's Fire Inspector.  Chaim immediately replied to Howard, defendants Cecere and Leonard, as well as the Department's other assistant building inspector, Shaun Petruzzelli ("Petruzzelli"), Doug Puff ("Puff"), Peekskill's plumbing inspector, and Shawana Milton, Peekskill's Code Enforcement Officer, asking the defendant, Cecere, when the sprinkler inspection could be scheduled.

42.   On July 6, 2020, defendant Cecere replied that Chaim would have to make arrangements with his assigned inspector, the defendant Leonard, and Puff.   Chaim immediately responded to the defendant, Leonard, asking him to coordinate the inspection.   Chaim then spoke with Leonard via telephone, who advised him that the defendant, Cecere, was "on it."

43.   The next day, July 7, 2020, Chaim emailed defendants Cecere and Leonard, as well as Puff, requesting clarification as to who would schedule the sprinkler inspection.

44.   The following day, July 8, 2020, defendant Leonard responded that he did not say that defendant Cecere "was on it now.  I said I will need to come there with [Ceceres], [Puff] and myself once your application gets approved for the sprinkler." This was the first time that Chaim became aware that the sprinkler system had not been approved since Roma said they could proceed with its installation, and it had been included in the plumbing permit and paid for.  Chaim responded by asking when it would be approved since the application had been submitted "months ago."

45.   Cecere responded, stating, *inter alia*, that the fire sprinkler system plans and application were submitted but never approved and although a permit was never issued the system was installed in violation of Peekskill's and the New York State Uniform Fire and Building Code.   He further stated that the project's delays were "a direct result of work being conducted

without proper permits, proper approvals, or improper craftsmanship. An indirect result of delays are required approvals from the Historic Board, Planning Board and Building Department."

46. None of Cecere's claims had any merit.

47. On July 16, 2020, Chaim emailed defendants Leonard and Cecere attaching the requested sketches prepared by Marchetti, together with his final signoff for the Property's framing, a copy of which is annexed hereto as Exhibit "1." Chaim then asked what was next.

48. As set forth in Marchetti's signoff, his office performed a site visit to address specific items of the framing and mechanical toilet exhaust ductwork. Marchetti detailed that the remedial work performed included (i) packing out of TJI Webs for oversized holes at the 2nd floor; (ii) attachment of steel plates to ends of TJI floor joists at the 2nd floor; (iii) temporary shoring of 1st floor joists @ basement level for chute; and (iv) reworking of the toilet exhaust fans to eliminate traps. Marchetti further stated that these items were addressed and re-worked in accordance with manufacturer's guidelines and their sketches.

49. On July 17, 2020, Chaim emailed defendants Cecere and Leonard to follow up on his June 25, 2020, e-mail asking why a new inspection date had not been scheduled and when to expect the permit for the roof hatch and sprinkler system. Chaim then stated that "We are at the same stage for 1 year already. We did

everything that have been requested.  Please help us complete this

building ASAP."

50.  Defendant Leonard responded later that morning providing

a number of items without giving a specific punch list:

It has taken you very long!! Here are just a few examples of
why:

-Work performed without proper approvals such as the
sprinkler system
-Most of the framing was done improperly
-Installation of roof mounted AC systems and wood panel walls
-Exterior façade brackets not approved by the historic board
-Working during the pandemic without approvals

Once all the repairs that needed to be completed are done
100% we will have to re-inspect again and make sure the work
was done accordingly to your engineer.

We will need original copies of sketches and the letter
stamped and signed by your engineer.

We can set up an inspection for next week.
Let's touch after we receive all original documents.
Have a great weekend.

51.  None of the issues set forth above by the defendant,

Leonard, had any merit.  Plaintiff Shia responded that same day,

rebutting each and every comment made by Leonard, a copy of which

is annexed hereto as Exhibit "2".  For example, with respect to

the sprinkler system, the permits were submitted on April 8, 2019,

together with the full permit submissions.  Plaintiffs received

the package a few days later that was approved by Roma, who advised

plaintiffs that they could install the sprinkler system. Defendant

Leonard however advised plaintiffs, without explanation, that they

needed a separate permit. Plaintiffs then resubmitted the permit application on September 26, 2019, without receiving a response for months.

52. With respect to defendant Leonard's claim that the framing was done improperly, the remedial work performed was done pursuant to Peekskill's code and with approval by the manufacturer as reflected by Marchetti's July 16, 2020, sign off.

53. With respect to installation of the roof mounted AC systems and wood panel walls plaintiffs were advised by Jessica Youngblood of the Historic & Landmarks Preservation Board that they could install them. After Ms. Youngblood was rebuked by the defendant, Leonard, Chaim was advised by Leonard to go through the Historic and Planning Boards, which plaintiffs did, receiving approvals by them on April 23, 2020, and May 12, 2020, respectively.

54. Defendant Leonard's reference to the exterior façade brackets not being approved by the Historic & Landmarks Preservation Board had nothing to do with the Project proceeding but rather, pertained to the issuance of the Certificate of Occupancy, which was being addressed by plaintiffs separately.

55. Defendant Leonard's claim that work was being performed during the pandemic without approvals was completely untrue. Leonard had cited as proof the March 28, 2020, accident, which as set forth above did not take place at the Property. Moreover,

Leonard inexplicably stated that he needed original copies of sketches and the letter stamped and signed by plaintiffs' engineer, Marchetti, despite the fact that plaintiffs had submitted them previously.

56.  Defendant Leonard failed to respond to plaintiff Shia's July 17, 2020, response.

57.  On July 22, 2020, defendant Leonard, while performing the framing inspection, pointed out to plaintiffs where the March 28, 2020, injury allegedly happened, claiming that the Department was inside the building right after the incident occurred.  Yet that very same day, after visiting the actual location of the accident, Peekskill Police Officer Jackman revised the official police report to reflect that the accident took place inside of 935 South Street and not the Property.

58. When plaintiffs Chaim and Shia asked defendants Cecere and Leonard while standing together outside after Officer Jackman left the premises whether they acknowledged that the accident took place elsewhere, they refused to answer.  Instead, Leonard remarked how "terrible" the framing was.  In response Chaim asked for a punch list to which defendant Leonard replied "figure it out yourself," rhetorically questioning how he could give a punch list when he could find other things to add.

59.  Also in attendance for defendant Leonard's inspection that day was Peekskill's then Mayor, Andre Rainey, who was

concerned by the continued delays in the Property receiving the necessary approvals to open, as was an attorney consulted by Chaim, Andrea N. Catalina, Esq. ("Catalina"), the plaintiffs, Chaim and Shia, and their architect, Croke.

60.  Following the inspection defendant Leonard demanded that Chaim fire Catalina because he "didn't want a lawyer on his back" and remove Shia as the project manager because he was too "challenging."  Chaim subsequently wrote to defendant Leonard on August 3, 2020, to advise that Shia had been removed and that a new project manager, Joel Berger of JP Developer, would be retained.  Berger however ultimately choose not to be engaged due to defendant Leonard's intransigence and unlawful conduct.

61.  By letter also dated August 3, 2020, a copy of which is annexed hereto as Exhibit "3," Catalina's office advised the defendant, Leonard, that although Chaim had consulted with her office, she had not been retained and that Leonard had authorization to speak directly with Berger.

62.  Later that month defendant Leonard improperly claimed that the Property's new prefabricated Wood I-joists, installed in September of 2019, needed to be replaced notwithstanding Marchetti's July 16, 2020, signoff.  The I-joist is an engineered wood product that has great strength in relation to its size and weight, carries heavy loads with less lumber than a dimensional solid wood joist and used in approximately half of all wood light

framed floors.  In the form of beams, they run from end-to-end and the floors then "sit" on them.

63.  Defendant Leonard's claim was premised on his unsupported subjective opinion that the sub-contractors made too many holes for wiring and piping despite the fact that plaintiff's engineer, Marchetti, approved the work performed.

64.  Defendant Leonard demanded that EACOM Timber Corporation ("EACOM"), who manufactured the joists, sign off on the current form of use, which it did via photos and emails stating the use of the joists was consistent with their intended use.

65.  On September 16, 2020, defendant Leonard advised that, with respect to the sprinkler system, that because the offset was greater than 15 degree and the sprinkler heads were located in the garbage chute, approval by a licensed engineer was needed.  That same day, John Frustaci of Premier Compaction systems ("Frustaci") asked Chaim to have plaintiffs' engineer review the garbage chute drawings and stamp them.

66.  On October 1, 2020, Chaim emailed the defendant, Leonard, asking when fabrication could begin on the garbage chute.  Defendant Leonard responded the following day, stating that he believed that the chute needed to extend a minimum of 48" above the finished roof and that the current drawing showed 36".

67.   On October 5, 2020, Frustaci responded to the defendant, Leonard, stating that that the National Fire Protection Association's Code required 3' above the roof, providing a link to the relevant portion.  Leonard did not respond.

68.   On October 13, 2020, Chaim emailed the defendant, Leonard, requesting a response to Frustaci's October 5, 2020, email.  Defendant Leonard responded, stating that he had been in mandatory training since the prior Monday, that he would review the drawings that week and advise if he had any questions.

69.   On October 15, 2020, and again on October 19, 2020, Chaim emailed the defendant, Leonard, asking whether he had reviewed the drawings.  No reply was received to either email.

70.   Chaim emailed the defendant, Leonard, again on October 20, 2020.  Leonard finally responded, stating that he had not had time to "fully review the drawings as we are extremely busy and it's only 3 of us. Your plans are on my desk and will be reviewed hopefully this week. Again, I will reach out to you when I am done reviewing the drawings."  Chaim replied that he was not trying to be "difficult" or have the plans signed now but rather, that Leonard give Frustaci the "go ahead" on his shop drawings that were signed by the engineer so that the fabrication process could be set up.  Defendant Leonard replied that they were "extremely

busy. I have received your multiple emails. Your plans are under review. I will contact you when they are ready for mail or pickup."

71.  On October 26, 2020, Leonard emailed Chaim, asking whether he had "been in contact with the manufacturer of the engineered framing members in your building. We have not heard a word from you regarding the repairs that need to be completed to make the building safe. We would like to meet the representative of the I-Joist company at the site once you have this set up from them in order to review the damaged lumber. Please let us know so we can schedule this."

72.  On November 10, 2020, Marchetti responded to the defendant, Leonard, attaching a letter from Beynon dated November 9, 2020, a copy of which is annexed hereto as Exhibit "4," as well as his own letter dated November 10, 2020, a copy of which is annexed hereto as Exhibit "5."  In his correspondence, which was addressed to Marchetti, Beynon stated, *inter alia*, as follows:

> Among my many duties at EACOM Timber Corporation, is to review all repairs to P3 Joist products.  I have reviewed both the damage and the repairs to the joists for the jobsite located in Peekskill NY, and certify that they are in accordance with EACOM's repair practices.

73.  In his November 10 correspondence addressed to the defendant, Leonard, Marchetti stated as follows:

> I have visited the above mentioned site after our request for repairs to the I-Joists was accomplished.

As you recall, the I-Joists, as manufactured by EACMM, were drilled out to accommodate the various utility services required for the apartments.  Our office documented with photos both the existing holes and the repairs implemented after our sketches were submitted to the Contractor/Owner.

The manufacturer of the I-Joists is based in Ontario, Canada.  They are unable to send a representative to the site but based on our sketches and the photos presented, they accepted the repairs performed on the I-Joists.  See attached letter.

Therefore, can you please schedule a framing inspection time at the site so the Owner/Contractor can advance the add work required.

74.  Defendant Leonard responded on November 12, 2020, stating that he had spoken with Benyon, who had described the "proper" repairs in an email sent on November 9, 2020, and that he had sent photographs taken "at the last inspection", which was July 22, 2020.  By defendant Leonard's own statement, the photographs he provided therefore did not accurately depict the joists as they existed on November 12, 2020, after they had been repaired.  Leonard further added, inexplicably, that Benyon had sent him "the pics you forwarded to him.  Please review his findings."

*2021*

75.  On January 28, 2021, Marchetti emailed the defendant, Leonard, advising that Beynon approved both the design and installation of the joists after reviewing both the repair detail design and photographs of the completed installation.  Marchetti

further stated that, as a licensed Engineer in the State of New York, he approved the repair and did not understand the requirement for an EACOM New York licensed engineer to add his approval since he was certifying the integrity of the repair detail and installation. Marchetti further advised that the installation meet the requirements of the New York State Building Code.

76.    Defendant Leonard responded that EACOM had sent directions as to how the repairs were to be completed, which were much different from the current completed repairs. However, Leonard had not inspected the Property since July 22, 2020, and therefore had no knowledge of the changes made and condition of the joists at this time.

77.    On February 12, 2021, J. Mark Bartel, P.E., ("Bartel") an EACOM engineer, emailed the defendant, Leonard, stating that he had

> been asked by Marchetti to comment on photographs of the I-joist repairs for 104 Division Street. Please call me at your earliest convenience so that I understand the reason and properly address the situation. I want to get this project on track

No response was received to Bartel's email.

78.    On February 15, 2021, Bartel again emailed the defendant, Leonard, and copied Beynon, providing

> sealed calculations for the revised repairs indicated in the attached PDF file. At this point, it is belt-and-suspenders to address the patchwork of repairs that have been done.

> The attached photographs indicate the added material for this revised repair.  I have reduced the file size of the photographs in case your email has a size limit, but can resend in higher resolution if necessary.  I am not in a position to verify from photographs.  You should be able to verify that the work has been done correctly in person.

79.    Defendant Leonard responded the following day, acknowledging receipt and advising that an inspection was scheduled that day, and that he would verify the work performed met the supplied sketches.

80.    Immediately following his site inspection defendant Leonard issued a letter setting forth seven (7) purported reasons why the framing did not pass inspection although the design and installation were approved by EACOM and Beynon. This was in fact an unlawful pretext by the defendant, Leonard, fueled by his racially discriminatory attitude toward plaintiffs, to further delay their project, as were the four (4) additional items he cited that day that were related to the sprinkler system and fire escape.

81.    That same day a building permit was finally issued for the construction of a platform on the Property's roof for the HVAC system, and installation of a roof hatch for access to roof.

82. On June 11, 2021, defendant Leonard attached the February 16 Punch List indicating several items that were outstanding, all of which were related to exterior work.  Chaim told Leonard that outside items could not delay an inspection on inside items.

Leonard then responded, without citing any authority, that he could not do the inspection before the sprinkler system was updated.

83.  Plaintiffs were therefore required to hire yet another engineer, Eli Schneider, P.E. ("Schneider"), at a cost of approximately $20,000.00, who emailed the defendant, Leonard, on June 15, 2021.  Schneider set forth in a letter attached thereto the reasons why he could not withhold an inspection, a copy of which is annexed hereto as Exhibit "6".  In response, defendant Leonard scheduled an inspection for June 25, 2021, which passed.

84.  On or about October 5, 2021, Leonard called Chaim to advise that he had stamped approvals for the sprinkler heads but that he needed to either withdraw approval or have a letter submitted explaining why the sprinkler system was different than what he thought it would be.  The original plans had sprinkler heads in the stairwell but these were removed in the "as built" plans that was stamped approved by the defendant, Leonard, who apparently did not bother to read it.

85.  On November 29, 2021, Chaim emailed the defendant, Leonard, asking what was needed to renew the Property's building permit.  Defendant Leonard replied as follows: (i) a copy of the old permit, (ii) a new application completely filled out; and (iii) a $3,300.00 check.  He further advised that if changes were made, stamped drawings different than the two sets of drawings dated for

2021 were required and submission of an updated "as build set" suggested.

86.  The following day, November 30, 2021, Chaim advised that there were no changes since the previous approved plans and that the application and fee would be filed that day.  Defendant Leonard however wrongfully refused to accept the permit's renewal later that day, inexplicably requesting "as built" plans.

87.  On December 1, 2021, Chaim advised Leonard via email that there had been no changes since the last "as built" plans that he had stamped.  He further stated that the next "as built" plan would be the one submitted for the final Certificate of Occupancy and requested that Leonard take the insurance and application previously submitted.

88.  Leonard responded that proper documentation was not presented, and he was told that "as built" drawings were being made.  Chaim immediately responded by providing the old permit, completed application, and a check for the filing fee.  He also confirmed that no changes had been made since the last set of drawings from October of 2021 nor were any intended.

89. Leonard replied that an updated permit was mailed to plaintiffs with the expiration date written on it and it was not up to the Department to search for records.  He also repeated the false claim that he was told that updated drawings were being

prepared.  He then stated that if plaintiffs were to submit all the documents, they would gladly renew the permit.

90.  Chaim immediately responded that the updated permit was never received, that there were no new plans and, requested confirmation that the completed application with the applicable insurance cards and filing fee would be sufficient.

91.  The following morning, December 2, 2021, Leonard changed his tune, now stating – without citing any authority - that the permit needed to be refiled as a new permit because it had been renewed once previously.  Plaintiffs were therefore forced to pay thousands more in filing fees, permits, drawings and insurance, in addition to incurring months of additional and unnecessary delay.

92.  On December 3, 2021, plaintiffs applied to renew the building permit received in 2019 and a renewal was issued on December 20, 2021, with an expiration date of December 20, 2022.

*2022*

93.  On March 21, 2022, Lebrecht received a "whistleblower" email from Arber Balidemaj ("Balidemaj"), a local real estate agent, a copy of which is annexed hereto and made a part hereof as Exhibit "7".  Balidemaj told Chaim that he had sent this email a day or two earlier to Peekskill's Mayor and other officials, as well as the entire Building Department.

94.  In his email Balidemaj reported that the defendant, Leonard, had been operating a home inspection business whilst

simultaneously employed as an Assistant Building Inspector by the City of Peekskill. Balidemaj further stated that he and "his team" utilized Leonard's home inspection service while Leonard was overseeing projects personally owned by Balidemaj in Peekskill, a blatant conflict of interest.

95.  The mutually beneficially relationship between Balidemaj and defendant Leonard ended when Leonard, together with the Department's other assistant building inspector, Petruzzelli, who upon information and belief was working for Leonard's private home inspection business, "butchered" a home inspection for a client of Balidemaj's on June 26, 2020.

96.  Balidemaj further reported that the defendant, Leonard, had been fired from his job as a teacher at a home inspection school and that he had strong armed Balidemaj into writing a letter of support for his wife, who was in danger of losing her job at the Yorktown Building Department.

97.  Balidemaj then stated as follows:

> Everything went downhill when I was working on a project and I was hired to consult for a Hasidic Jewish Family and company. The property Address is 102-108 S Division Street.  These gentlemen were also targeted and treated horribly and **[Leonard] told me multiple times how much he hated the "jews"** and how he dreaded working with them and how their framing sucks and how he couldn't wait for them to leave town because they ruined every area they went into. (emphasis added).

98.  Balidemaj reported that he met with Leonard on June 16, 2021, at which time:

I brought up working for [Lebrecht] on the building of
102-108 S Division Street and **he [Leonard] told me to
stay away from them or charge them 3 times the normal
price because it would cost me to get that building
approved by him.** (emphasis added).

99.  Balidemaj then recounted how the defendant, Leonard,
made multiple comments about "not liking" Chaim and his partners
"and not [l]iking [Chaim] in particular at all."

100.  On June 23, 2022, a Freedom of Information Law Request
for Records was submitted to the Department, which sought "any and
all records pertaining to the property known as 104 South Division
Street, Block/Lot Number 33.37-3-3." However, when the Department
finally issued its response, it failed to provide (i) any
communications between its building inspectors and 104, its
architect and engineers notwithstanding those cited above, nor
(ii) any internal communications pertaining to the Property.

101.  As of the filing of this Complaint, nearly three years
after receiving the appropriate variances, the Property still has
yet to receive approval for the water connection and a final
Certificate of Occupancy with no indication as to when they will
be issued.  As set forth in detail above the delays in completing
the Project were due to Defendants' unlawful and discriminatory
conduct due to the religious animosity of the defendant, Leonard,
toward plaintiffs.  Plaintiffs therefore have no recourse but to
file the instant action.

**AS AND FOR A FIRST CAUSE OF ACTION FOR THE**

## VIOLATION OF 42 U.S.C. § 1983
### FIFTH AMENDMENT VIOLATION

### (As Against All Defendants)

102.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "101" of this complaint with the same force and effect as if set forth at length herein.

103.    That as a result of the illegal and improper acts set forth above, all of which were done intentionally and with deliberate and undue callous disregard of Plaintiffs' rights, they were deprived of their Constitutional Rights secured under the 5th Amendment of The Constitution of the United States and 42 U.S.C. § 1983.

104.    Plaintiffs suffered religious discrimination in contravention of their civil rights because they were denied "the equal protection of the laws, equality of status under the law, equal treatment in the administration of justice, and equality of opportunity . . . ."

105.    Defendants intended to violate Plaintiffs' constitutional rights, knew their actions were arbitrary, capricious, violated the plaintiffs' rights and/or acted with reckless disregard for whether their actions violated Plaintiffs' rights and, were otherwise illegal.

106.  Plaintiffs have suffered, continue to suffer and will in the future suffer economic loss due to Defendants' impermissible conduct.

107.  Plaintiffs Lebrecht and Shia have suffered, continue to suffer and will in the future suffer emotional distress due to Defendants' impermissible conduct.

108.  Pursuant to 42 U.S.C. § 1983 Defendants, in their individual capacity are jointly and severally liable to the Plaintiffs for the financial losses they have and will suffer as well as compensatory damages for the emotional harm Plaintiffs have suffered.

109.  Since Defendants acted intentionally and in a wanton and reckless disregard of Plaintiffs' constitutional rights, they are entitled to punitive damages against Defendants jointly and severally.

110.  Plaintiffs are entitled to reasonable attorneys' fees, costs and disbursements incurred in the prosecution of this action.

111.  **WHEREFORE**, Plaintiffs pray for judgment as set forth below.

### AS AND FOR A SECOND CAUSE OF ACTION FOR THE VIOLATION OF 42 U.S.C. § 1983 FOURTEENTH AMENDMENT VIOLATION

### (As Against All Defendants)

112.  Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "111" of this

complaint with the same force and effect as if set forth at length herein.

113.   That as a result of the illegal and improper acts set forth above, all of which were done intentionally and with deliberate and undue callous disregard of Plaintiffs' rights, they were deprived of the Constitutional Rights secured under the Fourteenth Amendment of The Constitution of the United States and 42 U.S.C. § 1983.

114.   Plaintiffs were deprived of a protected liberty interest without due process of law.

115.   Defendants intended to violate Plaintiffs' constitutional rights, knew their actions were arbitrary, capricious, violated the plaintiffs' rights and/or acted with reckless disregard for whether their actions violated plaintiffs' rights and, were otherwise illegal.

116.   Plaintiffs have suffered, continue to suffer and will in the future suffer economic loss due to Defendants' impermissible conduct.

117.   Plaintiffs have suffered, continue to suffer and will in the future suffer emotional distress due to Defendants' impermissible conduct.

118.   Pursuant to 42 U.S.C. § 1983 Defendants, in their individual capacity are jointly and severally liable to the Plaintiffs for the financial losses it has and will suffer as well

as compensatory damages for the emotional harm Plaintiffs have suffered.

119.  Since Defendants acted intentionally and in a wanton and reckless disregard of Plaintiffs' constitutional rights, they are entitled to punitive damages against Defendants jointly and severally.

120.  Plaintiffs are entitled to reasonable attorneys' fees, costs and disbursements incurred in the prosecution of this action.

### AS AND FOR A THIRD CAUSE OF ACTION FOR THE VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 USC 2000e. et seq.

#### (Religious Discrimination)

121.  Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "120" of this complaint with the same force and effect as if set forth at length herein.

122.  The Defendants' conduct as alleged at length herein constitutes discrimination based on religion in violation of Title VII. The stated reasons for the Defendants' conduct were not the true reasons, but instead were a pretext to hide the Defendants' discriminatory animus towards plaintiffs.

123.  That as a result of the illegal and improper acts set forth above, all of which were done intentionally and with deliberate and undue callous disregard of Plaintiffs' rights, they

were deprived of the Constitutional Rights secured pursuant to Title VII of the Civil Rights Acts of 1964.

124.    Defendants    intended    to    violate    Plaintiffs' constitutional    rights,    knew    their    actions    were    arbitrary, capricious, violated the plaintiffs' rights and/or acted with reckless disregard for whether their actions violated plaintiffs' rights and, were otherwise illegal.

125.   Plaintiffs have suffered, continue to suffer and will in the future suffer economic loss due to Defendants' impermissible conduct.

126.   Plaintiffs have suffered, continue to suffer and will in the future suffer emotional distress due to Defendants' impermissible conduct.

127. Since Defendants acted intentionally and in a wanton and reckless disregard of Plaintiffs' constitutional rights, they are entitled to punitive damages against Defendants jointly and severally.

128.   Plaintiffs are entitled to reasonable attorneys' fees, costs and disbursements incurred in the prosecution of this action.

129.   **WHEREFORE**, Plaintiffs pray for judgment as set forth below.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR VIOLATION OF NEW YORK'S HUMAN RIGHTS LAWS

### (As Against All Defendants)

130.  Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "129" of this complaint with the same force and effect as if set forth at length herein.

131.  That as a result of the illegal and improper acts set forth above, all of which were done intentionally and with deliberate and undue callous disregard of Plaintiffs' rights, they were deprived of the Rights secured by the New York State Human Rights Law.

132.  Plaintiffs have suffered, continue to suffer and will in the future suffer economic loss due to Defendants' impermissible conduct.

133.  Plaintiffs have suffered, continue to suffer and will in the future suffer emotional distress due to Defendants' impermissible conduct.

134.  Plaintiffs are entitled to reasonable attorneys' fees, costs and disbursements incurred in the prosecution of this action.

135.  **WHEREFORE**, Plaintiffs pray for judgment as set forth below.

### PRAYER FOR RELIEF

**On the First, Second, Third and Fourth Causes of Action:**

1. For general damages according to proof at trial;

2. Punitive damages in an amount to be proven at trial;

3. Declaratory and Injunctive relief;

4. Attorneys' fees, costs and disbursements of this action;

5. For such other legal and equitable relief as the Court may deem Plaintiff is entitled to receive.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure Plaintiff demands a trial by jury in this action.

Dated:  Mount Kisco, New York
        October 21, 2022

                    Yours, etc.

                    **LAW OFFICES OF DANIEL W. ISAACS, PLLC**

                         **/s/**
        By:_____
            DANIEL W. ISAACS, ESQ.
            Attorneys for Plaintiffs

EXHIBIT "1"

EXHIBIT "2"

EXHIBIT "3"

EXHIBIT "4"

EXHIBIT "5"

EXHIBIT "6"

EXHIBIT "7"